Illinois Merchants Trust Company et al., Appellants,
v. Bertha F. B. Harvey, Appellee.

Gen. No. 32,171.

Opinion filed May 2, 1928.

Wilson, McIlvaine, Hale & Templeton, for appellants.

Mayer, Meyer, Austrian & Platt, for appellee.

Mr. Presiding Justice Taylor delivered the opinion of the court.

On July 30, 1925, the Illinois Merchants Trust Company, Chauncey Keep, and Marshall Field, as trustees of the residuary estate of Marshall Field, deceased, brought suit in trespass on the case on promises, as plaintiffs, in the superior court, against Bertha F. B. Harvey, as defendant, for $15,000.

On February 17, 1926, the plaintiffs filed a declaration containing two counts. The first alleged, substantially, the following: That on June 22, 1904, the defendant, together with Myra C. Botsford, as lessors, made a written lease of certain Chicago real estate, to Marshall Field, as lessee; that subsequently the term of the lease had been extended to, and included, April 30, 1980; that on March 9, 1921, the plaintiffs, as trustees, had succeeded to the rights and liabilities of Marshall Field under the lease and had paid to the lessors the rent for the years 1916 to 1919, inclusive; that the defendant on March 9, 1921, demanded that the plaintiffs pay to her income taxes levied against and collected from the lessors by the United States upon the rents paid by the plaintiffs to the lessors for each of the years 1916 to 1919 inclusive; that the plaintiffs denied that they were liable to pay such taxes; that the 11th article of the lease provided that if a default on the part of the lessee should continue 60 days after written notice thereof, the leasehold estate should be forfeited, and that upon forfeiture the lessee should surrender the building on the lands, which the lease demised, without any compensation being made or paid therefor by the lessors; that on March 9, 1921, the defendant delivered to the plaintiffs

a notice of default; that the notice stated that the plaintiffs were in default under the lease in that they had not paid the income taxes levied by the United States upon the rents paid by the lessee to them, the lessors, for each of the years from 1916 to 1919, inclusive, and that unless the default was made good within 60 days they would exercise their election to declare the term of the lease ended and avail themselves of the rights reserved in the lease upon it being terminated.

It was further alleged in the first count that at the time of the serving of the notice there was standing on the demised premises a building erected at a cost in excess of $1,000,000, which was under lease by the trustees to Marshall Field & Company for a term commencing November 1, 1917, and ending April 30, 1937; that Marshall Field & Company was occupying the building and conducting therein a retail dry goods business; that at the time of the lease of the building to Marshall Field & Company by the trustees, it was covenanted that the lessee should have quiet and peaceable possession of the building during the term of the lease; that in March, April and May, 1921, the leasehold estate demised by the lease from the defendants, Bertha F. B. Harvey, and Myra C. Botsford, to Marshall Field & Company, had a cash market value in excess of $2,000,000;

That the forfeiture of the lease from the defendant and Botsford would have caused a loss to the trustees of the leasehold estate and would have subjected them and the building to large claims for damages by Marshall Field & Company; that the building in March, April and May, 1921, was a part of a building fronting on Wabash avenue, in Chicago, and extending from the south line of Randolph street to the north line of Washington street, and was occupied, as stated above, by Marshall Field & Company;

That on March 6, 1921, a few days before the date fixed by the notice for the forfeiture of the lease, the defendant Harvey demanded that the trustees should pay to her, for the income taxes, as specified in the notice, and for interest thereon, and for the expenses of the defendant incurred in connection with enforcing payment of the taxes by the trustees, the sum of $8,350.97.

It was further alleged by the trustees that neither that amount, nor any amount, was due from them to the defendant; "that said trustees being then threatened by said defendant with the forfeiture of said lease and with the loss of the said leasehold estate and with the building located on said lands and being under compulsion and duress by the defendant * * * paid to the said defendant on the 6th day of May, 1921, the said sum demanded by her, to wit, the sum of $8,350.97, to prevent the forfeiture of said lease, threatened by said defendant as aforesaid, and to save said trustees from the loss and damage which would have resulted from the forfeiture of said lease; that said payment was made by said trustees to said defendant under protest to said defendant, that no part of the sum so paid to the defendant was due or owing to her from said trustees * * *.

"That said defendant having secured said sum from said trustees by threats, compulsion and duress, as aforesaid, then and there, to wit, on May 6, A. D. 1921, at to wit, Cook County, aforesaid, became and was obligated to pay said sum of $8,350.97, together with interest thereon, at the rate of five per cent per annum from said May 6, 1921, to said trustees, and then and there became indebted to said trustees in said amount";

That after May 6, 1921, and prior to July 30, 1925, the Merchants Loan and Trust Company consolidated with the Illinois Trust & Savings Bank to form the Illinois Merchants Trust Company, one of the plain-

tiffs; that the Illinois Merchants Trust Company succeeded to all the rights, claims and demands of the Merchants Loan & Trust Company against the defendant.

The second count of the declaration consists of the consolidated common counts.

The affidavit of amount due is for the sum of $10,347.09.

On May 2, 1926, the defendant filed four pleas. The first was the general issue; the second denied that the payment was made under protest, or on account of threats, compulsion or duress, and alleged that the facts upon which the claim was settled were fully known to the plaintiffs, and that the payment was made in satisfaction of the claim; the third alleged that, at the time of the payment, the plaintiffs were indebted to the defendant in the full amount of what was paid, and that the payment operated as in full accord and satisfaction of all matters and disputes between them, and the fourth set up the statute of limitations.

On August 5, 1926, replications were filed by the plaintiffs.

On March 28, 1927, the death of Arthur B. Jones was suggested, and the cause ordered to proceed at the suit of the Illinois Merchants Trust Company, Chauncey Keep, and Marshall Field, as trustees of the residuary estate under the will of Marshall Field, deceased.

There was a trial before the court, with a jury, at which the testimony of three witnesses, Loehr for the plaintiff, and Harvey and Fischer for the defendant, was taken, and certain exhibits were introduced in evidence.

The evidence is substantially as follows: On June 22, 1904, the defendant Bertha F. B. Harvey, together with Myra C. Botsford, as lessors, leased, in writing, to Marshall Field, as lessee, Lot 4 in Block 13 in Fort Dearborn Addition to Chicago, for a period

beginning July 1, 1904, and ending April 30, 1930, at a rental of $9,000 per annum, for the first 2 years and 10 months and at a rental of $13,000 per annum for the remaining 23 years.

Upon the death of Marshall Field in the year 1906, his interest in the lease passed into the control of the plaintiffs, trustees under his will, and has been under their control from that time on.

That portion of the lease which pertains to the matter of taxes is contained in the third article, and is as follows:

"THIRD. Said lessee further agrees to pay all taxes, water rates, special assessments and all other similar impositions of any and every kind which may be levied, assessed or imposed upon said premises, or any part thereof, or upon any building or improvement situated thereon, for or during the continuance of this lease, including five-sixths of the taxes levied thereon for the year 1904, (the said lessors agreeing to pay one-sixth of the taxes for 1904), which said taxes, assessments, water rates and other similar impositions shall be paid in the name of the said lessors before sale and before application for the judgment for collecting the same is made, and the receipts for such payments shall, within thirty (30) days after the respective payments evidenced thereby are made, be delivered to said lessors at the same place where said rent is payable."

It is provided in Article Fourth that the lessee, at his own expense, will construct, within five years from the date of the lease, a fireproof building, not less than eight stories in height, covering substantially the whole of the demised premises. In accordance therewith, the lessee, in August, 1906, completed such a building at a cost of approximately $680,000, and it has remained upon the premises in question ever since that time.

On May 20, 1916, pursuant to Article Ninth of the lease, the lessee extended the term of the lease for an additional period of 50 years, from and after April 30, 1930, at the same rental as specified in the lease for the last 23 years of the original term.

It is provided by Article Tenth of the lease that upon its termination by lapse of time or forfeiture, the lessee will surrender the demised premises with the buildings thereon to the lessors, without any compensation being made or paid for the buildings or improvements then upon the demised premises, except as provided thereafter in the lease.

Article Seventeenth provides—in the event of the termination of the term of the lease by lapse of time—for the payment of one-half of the appraised value of such parts of the party walls constructed by the lessee as the lessors may desire to use.

The lease contains no provision for payment in the event of the termination of the term by default.

Article Eleventh of the lease is as follows:

"ELEVENTH. It is expressly understood and agreed, by and between the parties hereto, that if the rent above reserved or any part thereof shall be behind or unpaid on the day of payment whereon the same ought to be paid as aforesaid, or default shall be made in any of the covenants or agreements herein contained to be kept by the said lessee or his assigns, and such default shall continue for sixty (60) days after written notice thereof to the said lessee, it shall and may be lawful for the said lessors at their election, to declare said term ended, and into the said premises or any part thereof, either with or without process of law, to re-enter, and the said party of the second part, or any person or persons occupying, in or upon the same, to expel, remove and put out, using such force as may be necessary in so doing, and the said premises again to repossess and enjoy as in their first and former estate."

On March 9, 1921, the lessors sent to the trustees of the estate of Marshall Field three written notices, each of which contained the following: "You are hereby notified that you are in default in the performance of the covenants of the lessee in that certain lease * * * bearing date the 22nd day of June, A. D. 1904." One of the notices specified as a default the failure of the lessee to pay the tax levied by the United States of America upon the rents paid by the lessee to the lessors under the terms of the lease for the years 1916 to 1919, both inclusive, another of the notices specified as a default the failure of the lessee to deliver to the lessors receipts for the tax contracted to be paid by the lessee within 30 days after the respective payments thereof, and another specified as a default the failure of the lessee to procure policies of insurance, as specified in the lease. The first of the above-mentioned notices contains the following:

"Your attention has been heretofore called to your failure to pay the tax levied by the United States of America upon the rents paid by the Lessee to the Lessors under the terms of this lease. You are in default in this respect as to the rental for each of the years 1916, 1917, 1918 and 1919, and you are notified hereby that, unless you make good your default in the performance of the covenants and agreements in said lease contained on the part of the Lessee to be performed as to the rentals herein mentioned within sixty days after this notice has been given to you, the Lessors will exercise their election to declare the term of said lease ended and avail themselves of the rights reserved in said lease upon the termination thereof."

Shortly after the receipt of the above-mentioned notices, the trustees held a conference with Mr. John P. Wilson, Sr., chief counsel of the Field Estate. (Mr. Wilson died prior to the trial.) A computation of the total normal and surtax on the amount of the rent for the years 1916, 1917, 1918 and 1919, plus interest at

5 per cent per annum, to May 10, 1921, showed it to be $4,166.71. After the receipt of the notices above mentioned, the trustees made a search of their files and records for the missing tax receipts, and assembled them, and also had the insurance rewritten under a separate policy on the building on the defendant's property, instead of having it, as it was formerly, blanket insurance.

About the first of May, 1921, Mr. John P. Wilson saw Mr. Harvey, who was the husband of the defendant, and authorized to act for her in the matter, and told him that he, Wilson, had received the notices and requested that he be furnished a bill for the items of the income tax. Mr. Harvey had an accounting firm make up a bill, which he then sent to Mr. Wilson in a letter dated May 6, 1921. The bill was for the income taxes paid by the lessors on the income or rent from the demised premises for the years 1916–1920, with interest, attorneys' and accountant's fees, as follows: Income tax, $6,324.34; interest to date, $576.63; attorneys' fees, $1,350; and accountant's fees, $100; total, $8,350.97.

The evidence of the witness Loehr, an officer of the Merchants Loan & Trust Company in 1921 (which was then one of the trustees of the Field Estate), was to the following effect: On May 6, 1921, he and Mr. John P. Wilson went to the office of Robert H. Harvey. He went to act as a witness to what might transpire. Mr. Wilson greeted Mr. Harvey, and told him that they (Wilson and Loehr) had come there in response to certain notices about defaults, or alleged defaults, in the performance of the covenants of the Botsford-Harvey lease. Mr. Wilson gave Mr. Harvey some of the missing tax receipts and the fire insurance policy, and also a check for $8,350.97. In giving the check, Mr. Wilson, said that "he was making payment of this claim for income taxes without in any way admitting the propriety of the demand and that he did not

think that the Field trustees owed any money on account of Mrs. Harvey's and Mrs. Botsford's federal income tax." Mr. Wilson said that "we didn't even compute or attempt to compute the amount of the tax but we paid the amount in accordance with Mr. Harvey's demand, and under the compulsion of the notice, which he had served, and paid it because the Field trustees could not afford to litigate the question of the propriety or the impropriety of the payment in any suit involving a possible forfeiture of the lease, and therefore he simply paid the rent (meaning income tax) in accordance with the figures that Mr. Harvey had submitted and to satisfy his demand without admitting the justice of the demand."

The evidence of Robert H. Harvey, who acted for the defendant, his wife, was to the following effect: The first time he had any communication with the Field Estate, or any of its representatives, in reference to the subject matter of the three notices, was in the first part of May, 1921. He met Mr. Wilson at the University Club and was asked if he would meet him at his (Harvey's) office. He agreed to see him, and a few days later, Mr. Wilson called, alone. Mr. Wilson told him that he had received the notice and would like to have him make up a bill for the items. Following that, he had a bill made up and sent to Mr. Wilson. A few days later, about May 6, Mr. Wilson called again, and with him came Mr. Loehr. Mr. Wilson said he had brought a check for the bill and the tax receipts. Mr. Harvey then called in his credit man, Fischer, who checked the tax bills with Loehr. The witness Harvey, in his direct examination, concerning what Mr. Wilson said when he gave the check, states that Mr. Wilson did not say anything about the estate paying the money under protest, but later, on cross-examination, when asked whether Mr. Wilson ever told him, prior to May 6, that the Field trustees, in his opinion, were not liable to pay this tax and that

that was his position, or used words to that effect, he (Harvey) answered, ''I think he did,'' and when further pressed on the same matter as to the date of the conversation, he answered, ''I cannot state whether it was prior or at what time. It may have been the day he came in with the check.'' Harvey, when asked what he said in reply when Mr. Wilson told him on May 6, or prior thereto, that the trustees of the Field Estate did not regard themselves as liable to pay for the tax, answered, ''I told Mr. Wilson if he did not wish to pay it, we would endeavor to collect it.''

The evidence of Fischer, employed by Harvey's Company, and called on behalf of the defendant, is to the following effect: That he served the above-mentioned notices; that he saw Mr. Wilson come into Dr. Harvey's office on one occasion, alone; that on May 6, Mr. Wilson came in with Loehr; that he, Fischer, went into Harvey's office to take up the tax receipts and did so with Loehr; that he heard Mr. Wilson say that he had come in to tender the check, but did not hear him state that the trustees were liable, although it might have been said before he (Fischer) went into the office.

At the close of all the evidence, upon a motion by counsel for the defendant, the court instructed the jury to find the issues for the defendant. In accordance with that instruction, a verdict was rendered and, after overruling motions by counsel for the plaintiffs, for a new trial, and in arrest of judgment, the trial judge entered judgment in favor of the defendant and against the plaintiffs. This appeal is from that judgment.

On May 6, 1921, when Mr. Wilson, on behalf of the trustees, the lessee, gave to Mr. Harvey, the representative of the defendant, a check for $8,350.97, there was no case in the State of Illinois which definitely decided whether or not the provisions in a lease, similar to those contained in the one in question, bound the lessee to pay the income taxes of the lessors levied

upon the rents paid under such a lease. On April 23, 1914, the Supreme Court of this State, in the case of *Northern Trust Co. v. Buck & Rayner,* 263 Ill. 222, decided that such a lessee was not bound to pay an inheritance tax assessed against the lessor's interest in a lease at the lessor's death. But it was not until October, 1923, that it was decided by the Supreme Court, in *Young v. Illinois Athletic Club,* 310 Ill. 75, that provisions in a lease, similar to those of the one in the instant case, did not require the lessee to pay income taxes assessed against the rents paid under the lease. In that case the court said:

"Such tax is not a tax against the real estate, and under the holding in the *Buck & Rayner* case, *supra,* cannot, in the absence of terms which expressly or by clear implication include it, be made a part of a covenant in a lease. We are of the opinion that it was not the intention of the parties to this lease that the income tax levied on the rentals should be paid by the lessee."

Such being the law, the question now arises, therefore, whether the plaintiffs having paid the $8,350.97 demanded by the lessors—it being conceded by counsel for the defendant that under the ruling in the *Young* case the plaintiffs were not required to pay income taxes assessed against the rents paid under the lease in question—are entitled to recover the money back, on the ground that the payment was made under duress or compulsion, or what would be considered equivalent thereto. There is duress of property as well as duress of person. The duress claimed here is of the former character.

Did the threat of forfeiture of the leasehold estate and buildings, on account of which the payment here sued for was made, constitute duress of property? The contention of the defendant is that it did not constitute duress because (1) the plaintiffs could have tried out in the threatened forcible detainer suit their

liability to pay, and (2) even if defeated in a forcible detainer suit, the plaintiffs could have redeemed the property in equity, or could have enjoined the forfeiture. On the other hand, it is the contention of the plaintiffs that although it be admitted that a mere threat of an ordinary lawsuit does not constitute duress; that if the defendant had not sought a forfeiture of the lease, but had merely threatened to bring a suit at law to collect the taxes which were claimed as additional rent, then a payment made to avoid such a suit would not have been made under duress, yet, in a forcible detainer suit brought after the forfeiture, or to enforce the forfeiture, the plaintiffs would have had no adequate means of defense, and that, therefore, the conduct of the defendant constituted duress, and that, under the law, the plaintiffs in the instant case had no clearly established right, either to redeem from a forfeiture in equity, or to enjoin a forfeiture.

Counsel for the plaintiffs in their reply brief, in answer to the argument of counsel for the defendant, state the following: ''As a test of duress (which is by no means always applied) it has sometimes been said that the plaintiff pays under duress only when he has 'no other remedy.' But when this test is examined it is found to be limited as follows: (1) the other remedy referred to relates to remedies at law, not to remedies in equity, and (2) the remedy must be clear and well established,'' and they urge that the instant case is controlled by *Chicago & E. I. R. Co. v. Miller*, 309 Ill. 257, and the cases therein cited, and that whether the tests suggested by counsel for the defendant are applied or not, it clearly appears that the payment made was under duress. In the *Miller* case, the Illinois Commerce Commission threatened to withhold their approval of a bond issue unless a certain illegal fee was paid. The threatened loss to the railroad involved a large sum. The court held that the

payment of the illegal fee demanded was made under duress, and sustained the right of the plaintiff to recover.

In a number of cases the Supreme Court has held that the circumstances did not amount to duress, and that the payments made could not be recovered. Such cases are *Stover v. Mitchell*, 45 Ill. 213; *Swanston v. Ijams*, 63 Ill. 165; *Conkling v. City of Springfield*, 132 Ill. 420; *Walser v. Board of Education of School Dist. No. 1*, 160 Ill. 272. In the last three cases it was held that the payment of an illegal tax on real estate was not a payment under duress, because the taxpayer could make his defense in the suit brought to sell the land for taxes. In those cases neither penalties nor forfeitures were involved. In the *Conkling* case, *supra*, the court said (p. 423):

"As a general rule, where a person is compelled, by duress, to pay an illegal tax for which he is not liable, he may recover it back. The rule on this subject is well stated by Shaw, C. J., in *Preston v. Burton*, 12 Pick. 13, as follows: 'A party who has paid voluntarily, under a claim of right, shall not afterwards recover back the money, although he protested at the time against his liability. * * * But it is otherwise when a party is compelled, by duress of his person or goods, to pay money for which he is not liable. It is not voluntary, but compulsory, and he may rescue himself from such duress by payment of the money, and afterwards, on proof of the fact, recover it back.' "

There are a great many cases in the books on the subject of duress, and they are not all in accord. In this State, however, the Supreme Court has found duress to exist in cases where payments have been exacted by public service corporations; where money has been exacted by one private individual from another, and in cases where there were payments of taxes or other charges by a person to county or State authorities. *Bradford v. City of Chicago*, 25 Ill. 411;

*Spaids v. Barrett,* 57 Ill. 289; *Chicago & A. R. Co. v. Chicago, V. & W. Coal Co.,* 79 Ill. 121; *Pemberton v. Williams,* 87 Ill. 15; *City of Chicago v. Northwestern Mut. Life Ins. Co.,* 218 Ill. 40; *Illinois Glass Co. v. Chicago Tel. Co.,* 234 Ill. 535.

Pertinent cases in the United States Supreme Court are the following: *Atchison, T. & S. F. R. Co. v. O'Connor,* 223 U. S. 280, and *Union Pac. R. Co. v. Public Service Commission of Missouri,* 248 U. S. 67.

In the *Miller* case, already mentioned, the Supreme Court of this State said:

"It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy. It is true that appellee chose to comply with the plain provisions of the Public Utilities act rather than suffer the losses certain to follow in an effort to market the stock and bonds without the approval of the Commerce Commission, but this does not make its act voluntary. Conduct under duress always involves a choice, but this court has held that the making of a choice under such circumstances does not estop the person acting under duress from later asserting his rights. (*Spaids v. Barrett,* 57 Ill. 289; *Chicago and Alton Railroad Co. v. Chicago, Vermilion and Wilmington Coal Co.,* 79 id. 121; *Pemberton v. Williams,* 87 id. 15.) In *Atchison, Topeka and Santa Fe Railroad Co. v. O'Connor,* 223 U. S. 280, 32 Sup. Ct. 216, the company brought an action to recover a capital stock tax paid under protest. In disposing of the point the court said: 'In this case the law, besides giving an action of debt to the State, provides that every corporation that fails to pay the tax shall forfeit its right to do business within the State until the tax is paid, and also shall pay a penalty of ten per cent for every six months, or fractional part of six months, of default after May 1 of each year. It may be that the forfeiture of the right to do business would not be authoritatively established except by a *quo warranto* provided for in

a following section, but before or without the proceeding the effect of the forfeiture clause upon the plaintiff's subsequent contracts and business might be serious, and in any event the penalty would go on accruing during all the time that might be spent before the validity of the defense could be adjudged. As appears from the decision below, plaintiff could have had no certainty of ultimate success, and we are of opinion that it was not called upon to take the risk of having its contracts disputed and its business injured, and of finding the tax more or less nearly doubled in case it finally had to pay. In other words, we are of the opinion that the payment was made under duress.' ''

In the *Northwestern Mut. Life Ins. Co.* case, *supra,* which was brought to recover water rates paid to the city by the plaintiff, for water delivered prior to the purchase of certain real estate, the court said:

"Appellant and appellee did not stand upon the same footing, as appellant had the power and means to deprive appellee of its water supply, and had threatened to exercise this power, and had in some instances actually shut off the water."

In the *Spaids* case, *supra,* where the defendant levied an attachment on a shipment of oysters belonging to the plaintiff and refused to give them up except upon payment of more than was due from the plaintiff to him, it was held that the plaintiff could recover the sum so paid, because it was paid to obtain possession of property wrongfully held. The court said, after considering whether there was any difference between duress of the person and duress of property:

"We can not forget the fact that the desire for property is a strong and predominant characteristic of man, in organized society. An act done, prompted by this desire to preserve, and impelled by fear of the

destruction of goods, is not voluntary. It is an act of compulsion.''

In the *Illinois Glass Co.* case, *supra*, although the issue did not directly involve the question whether money was paid under duress, but whether an overpayment to a public service corporation could be recovered, the court said:

''The ancient doctrine of duress of person, and later of goods, has been much relaxed and extended so as to admit of compulsion of business and circumstances, and perhaps a telephone corporation having a system in general operation and connected with customers and other business houses might reasonably influence a business house to make an unwilling payment of an amount illegally demanded, which would make the payment compulsory.''

On that subject, the court cites in its opinion the following cases: *County of La Salle v. Simmons,* 5 Gilm. (Ill.) 513; *Bradford v. City of Chicago,* 25 Ill. 411; *Elston v. City of Chicago,* 40 Ill. 514; *Chicago & A. R. Co. v. Chicago, Vermilion and Wilmington Coal Co.,* 79 Ill. 121; *Pemberton v. Williams,* 87 Ill. 15.

An examination of the authorities of this State seems to show that ever since the decision in *County of La Salle v. Simmons,* 5 Gilm. (Ill.) 513, which is cited in the *Illinois Glass Co.* case, the conduct of the defendant, as shown by the evidence in this case, would have been considered as creating and constituting duress of property, and the payment made by the plaintiffs as made under compulsion.

The lessor gave a 60-day notice of default pursuant to the terms of the lease. The lease provided that the defendant should ''pay all taxes, water rates, special assessments, and all other similar impositions of any and every kind which may be levied or imposed upon said premises, or any part thereof,'' and made a failure on the part of the tenant to make any such payments a ground of forfeiture. Further, in the event

of forfeiture, the lease provided that the building should belong to the lessor without any compensation being made, and also required the lessee to build party walls for which (in the event of forfeiture) no compensation should be made.

That being the situation, the lessor demanded that income taxes, and certain expenses in connection therewith, should be paid by the lessee, claiming that they were taxes which the lessee was bound to pay. The lessor could have merely made a demand for the payment of the taxes, and, if not paid, instituted suit in order to obtain judgment. Such a demand and such a suit would not have been duress, as the parties would have been in an equal position before the law, there being no danger of forfeiture. As urged by counsel for the plaintiffs, in a suit of assumpsit thus brought, the lessor could have recovered only the sum demanded, and the question of whether or not the lessee were liable to pay the lessors' income taxes could have been settled in a case where the parties stood on equal terms before the court. The evidence shows that the defendant gave a 60-day notice of default, pursuant to the terms of the lease, and informed the plaintiffs that unless the money demanded was paid in the 60 days, the defendant would declare the term ended, and avail herself of the rights reserved in the lease upon such termination, which rights included the right to end the term of the lease, so that the remaining part of it would be forfeited, the right to take over the entire building without compensation, and the right to require the lessee to erect party walls which also would be taken over and used by the lessor without compensation.

The plaintiffs having received the notice of default in payment of income taxes were given a choice of action. They could have allowed the 60 days to expire, and, if the lessor had proceeded with an action for possession, defended that action on the ground

that they were not obliged to pay the taxes. Of course, if they had elected to take that course, they would have jeopardized their leasehold estate, plus the value of the buildings, in order to avoid the payment of $8,350.97. They chose to make the payment, and, in our judgment, applying the principles laid down by the Supreme Court, did so under duress.

Counsel for the defendant state in their brief that the plaintiffs did not pay under compulsion or duress, because they had adequate means of relief either by filing a bill in equity, or by defending an action of forcible entry and detainer brought by the defendant, the lessor, to oust them from possession if the lessor elected to terminate the lease because of the alleged default, or by prosecuting an action for forcible entry and detainer if the lessor took possession of the premises without process of law after electing to terminate the tenancy because of the alleged default, and that equity would relieve the lessee and set aside the forfeiture incurred because of his breach of the condition to pay a sum certain, whether the lessor has or has not entered and dispossessed the tenant.

The weight of authority, however, in this State seems to be that there is neither a right to redeem from such a forfeiture of a lease, nor a right to enjoin a threatened forfeiture. *Chadwick v. Parker,* 44 Ill. 326; *Kew v. Trainor,* 150 Ill. 150; *Schimelfenig v. Howell,* 172 Ill. App. 201; *Palmer v. Ford,* 70 Ill. 369. In the latter case, the bill was filed by a tenant asking for an injunction to restrain his landlord from prosecuting suits commenced against certain other tenants occupying portions of the building, and to redeem the premises from a forfeiture taken by the lessor. In the course of the opinion, the court said:

"The lease conferred upon appellant the clear right to declare a forfeiture for the non-payment of rents, and if the power reserved was properly exercised, then the bill ought to have been dismissed; but if there was

no declaration of forfeiture, and the contracts alleged, in regard to the collection of rents and the completion of the buildings, were made, then there were clear grounds for equitable relief.''

Counsel for the defendant have cited *Mulvey Mfg. Co. v. McKinney,* 184 Ill. App. 476, and *Watson v. Smith,* 180 Ill. App. 289, as being *contra,* but upon an examination of them, we are of the opinion that they are distinguishable, and, in any event, do not establish the law as contrary to what has been stated above.

In our judgment, the threat to forfeit the leasehold estate; the grave doubt whether the lessee could successfully defend against a declared forfeiture; the total absence of any consideration or *quid pro quo* for the payment; the immense disparity between the judgment of $8,350.97 and the great value of the leasehold estate and buildings, the loss of which was threatened; the unequal position of the parties before the law at the time of the payment; the seeming reasonableness of the choice made by the lessee all taken together lead to the conclusion that the payment was brought about by such conduct on the part of the lessor as is denoted by the law as compulsion, or coercion, or duress.

Inasmuch as there was no denial that the money was paid under protest, and as the arguments made here in the briefs of counsel are based upon that assumption, and as, based upon that assumption of fact, in our opinion, the law authorizes recovery by the plaintiff, the judgment will be reversed and judgment entered here in favor of the plaintiffs in the sum of $11,269, which total sum is made up of $8,350.97 with interest thereon at 5 per cent per annum from May 6, 1921, to date.

*Reversed and judgment here.*

Holdom and Wilson, JJ., concur.